Christian, J.
John Walden filed his bill in the Circuit court of Fauquier county, in which he alleged that Robert Beverley had instituted against him an action of unlawful entry and detainer, to recover from him the possession of a certain tract of land, lying in said county, containing 870 acres, on which the said John Walden then resided. He further charged, that in the month of May, 1863, he was approached by Beverley with offers to purchase his farm. That, prior to these negotiations for the purchase of his farm, Beverley had sought and effected various purchases of "horses, cattle, &c., and had discovered that he was in a frame of mind which incapacitated him from protecting his just rights in contracts with bold and unscrupulous men; that, emboldened by his success in this minor traffic, Beverley conceived the plan of bargaining the said Walden out .of his valuable homestead.” That, accordingly, Beverley made offers for said land, which resulted in a contract of sale, dated June 4th, 1863, which was afterwards consummated in due form by deed bearing date July 8th, 1863.
*150 He further charged, that “ at the time he sold his farrQ to Beverley, and for months before, and afterwards, his health was extremely delicate; that he was affected & chronic inflammation of the bladder, which oftentimes brought him in mortal agony to the verge of the grave; that he was never free from bodily pain, ■ although there were intervals when the paroxysms subsided, in lohich he could engage in an active watchfulness over his property. That at that period, the whole country was under constant excitement and alarm; that the marches of hostile armies, the visitation of ruffian marauders, and the general insecurity of life and property, filled every man with trouble and anxiety.” That, in addition to all these sources of irritation and depression, “ he was borne down with difficulties and troubles of a domestic nature ” (the character of which he declines-to state), which he says were enough to have unsettled his judgment.
He further states, that he looks back upon the facts he narrates, “ with astonishment at the part he enacted, and that he is satisfied that) possessed of his proper reason, he never would have played such a role.” Then proceeding, says “he believes, and therefore charges, that, at the time of entering upon the sale of his land, of executing the said contract and deed, he was not of a sound contracting mind and judgment;” and that the disease under which he wras laboring, with other causes of anxiety and trouble, had so far unsettled his reason, as to make him an easy prey to the unscrupulous avarice of Beverley.
After referring to certain sales of personal property to Beverley, at different times, at low prices, which he says he would not have made if he had possessed his natural shrezodness, Walden further charges in his bill, “ that it was after this experience of his incapacity to-protect himself in matters of contract, and with a perfect knowledge of his debility, both of body and *151 mind, that Beverley opened negotiations for the purchase of his homestead. That, by earnest and persistent solicitations, he succeeded in procuring the contract for sale, and finally the formal execution of ■ the deed, whereby, for the grossly inadequate price of §40 per acre in Confederate currency, under the forms of law, he deprived himself and family of their home.”
The bill further alleges, that the whole of the purchase money, to wit: the sum of thirty-four thousand seven hundred and ninety dollars, was fully paid in August, 1863; that, by the terms of the original contract, Walden occupied the land till the 1st of January, 1864, paying, as rent for the same, a certain part of the hay raised on said farm. That, on the 1st January, 1864, the parties entered into a written contract, under seal, by which Walden rented the farm for the year 1864, and, by a written memorandum at the foot of this agreement, the same contract of rent was continued for the year 1865.
The bill further alleges, that about the time of the contract of rent, to wit: on the first day of January, 1864, he (Walden) “ began to realize the ruin which, by his own acts, he had brought upon himself; that he found himself a renter of his own farm, and managing it as agent for another; that, though not yet restored to his proper health of mind and body, he now, nevertheless, begun to assert a claim to his farm, determining that, when the proper time came, he would contest Beverley’s right, under all his contracts and deed. That, in July, 1865, the country having become settled, and there being a fair prospect that courts of justice would again assume their sway, he deemed it a fit time to disclose to Beverley the position he designed to take in regard to the land;” which he accordingly did early in July, 1865.
Upon these facts, and others not necessary to refer to, stated in his bill with great elaboration and minute *152 ness, lie prays that Beverley may be enjoined and restrained from further proceedings at law to enforce the ■judgment which Beverley had obtained in an action of unlawful entry and detainer, until the question of title could be fully adjudicated between them; that the contract and deed might be declared null and void; and that he might be restored to his rights, in like manner as if the same had never been executed.
To this bill the defendant, Beverley, promptly filed his answer, in which he indignantly denied every imputation of fraud, and “all contrivance, artifice and deception, either expressed or to be implied from the statements of the plaintiff’s bill, and all intent to defraud the complainant, based upon his ignorance and discovered imbecility or weakness, in his intercourse with him about the sale of horses, referred to, or at any other time.” But, on the contrary, he found him to be a man of sense in business matters, with whom he dealt fairly, without any attempt at imposition or fraud. That so far from procuring the contract for the sale of his land, by earnest and persistent solicitations, the proposition to sell came from Walden. That he did not seek him to make the purchase; but that, being at Walden’s house on other business, he happened to mention that he was going to look at a farm some miles distant, which had been offered for sale, when Walden said he would sell either of his two farms: the farm on which he resided at $40 per acre, or his farm known as “ Carter’s Bun” at $25 jier acre. That he declined to purchase, saying he would first look at the other farm he had mentioned, and if he did not buy that farm he would return in a week or two and look at Walden’s farm. That not having made the purchase he was contemplating, he did return in two weeks after, and rode over both of Walden’s farms. That he declined purchasing the “Carter’s Bun” farm at $25 per acre, but agreed to purchase the farm on which Walden re *153 sides at §40 per acre, that beiDg the price at which ■Walden, offered it. The contract was then written and signed between them, by which it was agreed that §20,000 should be paid on the 1st August, 1863, and •the residue on the 1st January, 1864. That some time afterwards, complainant, in' person, requested respondent to pay the first instalment before the 1st August, in order to his making an investment in eight per cent. Confederate bonds; which request was complied with by respondent paying §20,000 on the 11th July, 1863. The residue of the purchase money having been fully paid, a deed for the land was prepared, dated July 8th, 1863, written wholly in the handwriting of John Walden (the complainant), and was executed in the absence of respondent; nor was he present when the deed was acknowledged for record. And that the whole sale was thus begun, conducted and consummated, by the complainant Walden, freely, without even the presence of respondent to influence or control his action in its execution.
Beverley also denies that Walden was laboring under any imbecility or weakness of understanding. He denies that he knew anything of any bodily infirmity or -domestic troubles. Indeed, he denies all the material averments of the bill. He also calls attention to the manner and form in which Walden insinuates his own incapacity as a deduction of his present reasoning from the facts of the case, as stated by him, to show that “ he could not bring himself to aver his own incapacity as a fact, but insists on it as a logical inference in order ■to avoid his deed.”
The depositions of numerous witnesses were taken by both plaintiff and defendant; and the cause coming on to be heard at the April term, 1868, before the Circuit court of Fauquier county, that court entered a decree directing that an issue be made up and tried on ■the common law side of this court, before a jury to be *154 impanneled therefor, to ascertain whether or not John Walden, at the time of the execution of the contract dated June 4th, 1863, and of the deed dated July 8th, qggg? p^g anc| proceedings set forth, was of sound mind and understanding, capable of executing said contract and deed. It is from this decree that an appeal has been allowed to this court.
While it is true that directing an issue to be tried by a jury is a matter of discretion in a court of equity, it is equally true that such discretion must be exercised upon sound principles of reason and justice. A mistake in its exercise is a just ground of appeal; and the Appellate court must judge whether such discretion has been soundly exercised in a given ease. Wise v. Lamb, 9 Gratt. 294; Stanard v. Graves, 2 Call 369; Gardner v. Gardner, 22 Wend. R. 526; Dale v. Roosevelt, 6 Johns’ Ch. R. 255; Reed v. Cline’s heirs, 9 Gratt. 136.
It seems to be now well settled, that, in no case, ought an issue to be ordered to enable a party to obtain evidence to make out his ease; that, when the allegations of the bill are positively denied by the answer, and the plaintiff has failed to furnish two witnesses, or one witness and strong corroborating circumstances, in support of the bill, it is error in the chancellor to order an issue; that no issue should be ordered until the plaintiff has thrown the burden of the proof on the defendant; that, until the onus is shifted, and the case rendered doubtful, by the conflicting evidence of the opposing parties, the defendant cannot be deprived by an order for an issue, of his right to a decision by the court on the ease as made by the pleadings and proofs. Smith’s Adm’r v. Betty and others, 11 Gratt. 752; Pryor v. Adams, 1 Call. 382; Wise v. Lamb, 9 Gratt. 294; Grigsby v. Weaver, 5 Leigh, 197. In the language of Judge Carr, in the case last cited: “It is the bounden duty of the plaintiff, who calls for the sol- *155 emu judgment of the court, to furnish that court with something like certainty on which to rest that judgment; he may draw this from the defendant if he can; he may prove it by witnesses; he may establish it by documents; but in some way he must shew it, or he fails, and his bill must be dismissed.”
These well established principles are now to be applied to the case before us. It is first, however, worthy of remark, that the chancellor was so well satisfied that the plaintiff had entirely failed to sustain, by the proofs, the charge of fraud and undue influence, which was a prominent feature of his bill, that he directs no issue upon that subject; and I am constrained to say, looking carefully to all the evidence contained in the voluminous depositions in the record, that there is nothing, outside of the charges in the bill, to create the slightest suspicion of fraud or undue influence on the part of Beverley. There was nothing in the relation of the parties, or in the character of their intercourse and dealings with each other, which can give rise to such an imputation. The chancellor seemed to be of-the same opinion, for he confines the issue which he ordered, to the single question of the capacity or incapacity of the plaintiff to make a contract. Whether he should have directed that issue, is the question we are now called upon to decide.
Before we consider the proofs in the case, to ascertain whether it comes within the principles of law already laid down as governing such cases, it is worthy of notice, that the plaintiff, in his own statement of his case, hesitates, if he does not fail, to distinctly allege his own incapacity. He seems, himself, to doubt the fact of his own incapacity. It seems to require, to satisfy his own conscience, a statement of facts, and a process of reasoning upon those facts, to bring himself reluctantly to the allegation of his mental unsoundness. He says that, “ looking back ” to the facts he *156 has narrated, “ he is astonished at the part he enacted satisfied that, possessed of his proper reason, he never would have played such a roleand ^en gayg £hat kelievegj an¿ therefore charges, that he was not of sound mind at the time he executed the contract of sale and deed to Beverley. Ho one can read the plaintiff’s bill without discovering a manifest hesitation and reluctance to bring himself to aver his own incapacity, and at the most, he rather insists upon it as a logical inference than avers it as a fact. He admits, too, that there were intervals, even during the time of his alleged incapacity, when “ he could engage in an active watchfulness over his property.”
There is another noticeable feature in the plaintiff’s bill, which, to say the least of it, does not commend his case very strongly to the favorable consideration of a court of equity. He states that in January, 1864, (when it is admitted on all hands, even by himself, that he was under no disability for want of capacity,) he began to realize the ruin which by his own acts he had • brought upon himself, and began to prepare to assert a claim to his farm, determining that, when the proper time came, he would contest Beverley’s right under the deed. And so it seems, that, though he executed then, when there was no incapacity existing or alleged, a contract under seal, renting the land from Beverley, which contract recognized the conveyance from himself to Beverley, in express terms, yet he admits, in a bill which asks relief from fraud and imposition, that he was himself practicing deceit and false dealing, in order to retain possession of the land. Such allegations of the plaintiff’s own duplicity and deceit, present his case in no favorable aspect to a court of equity.
The answer of Beverley denies all the material allegations in the bill, and puts them all in issue. According to the well established rule, to overcome this an *157 swer there must he two witnesses, or one witness and strong corroborating circumstances produced by tbe plaintiff. To relieve tbis case from tbe operation of that rule, tbe learned counsel for tbe appellees insist that tbe denial of tbe incapacity of Walden by Beverley, is not entitled to tbe usual weight given to tbe answer of a defendant denying the allegations under oath of a plaintiff’s bill; because, as they argue, tbe defendant Beverly did not know and could not be informed of tbe fact, whether be was of unsound mind or not. I do not perceive tbe force of tbis position, nor is it supported by tbe authorities cited. Beverley is charged with procuring fraudulently and by undue influence, tbe deed in question, from the plaintiff, at a time when be was laboring under mental incapacity. He not only denies all fraud and undue influence imputed to him, but denies that be was of unsound mind, and asserts bis mental soundness and capacity. His answer is not a mere denial of bis incapacity, but be shews that be bad opportunities of knowing bis condition by intercourse and dealings with him. He refers to pregnant facts to shew upon what bis opinion of plaintiff’s mental condition was founded, and to establish tbe mental capacity and soundness of tbe plaintiff. He refers to tbe deed itself, written wholly in tbe band-writing of tbe plaintiff, most carefully prepared, with great minuteness as to boundaries. He exhibits letters which in themselves exhibit tbe most unmistakable evidence of tbe emanations of a sound mind. Belying upon these facts, and shewing in bis answer bis opportunities for his knowledge of what he states, be denies the-mental incapacity of tbe plaintiff; and tbis denial, made under such circumstances, not only puts tbe fact of sanity in issue, but must have tbe same weight astbe denial under oath, of any other material allegation in tbe bill.
How let us see what is tbe evidence which tbe plain *158 tiff introduced to overcome the force of the defendant’s answer.
He proves, by a number of witnesses, that he was laboring under a painful malady, iron which, at times, he .suffered great agony; that he had serious domestic troubles; that he was much depressed by the unhappy condition of the country; and that he was an old man bordering on seventy years.
These witnesses give it as their opinions, that all these causes combined, had borne so heavily upon him as seriously to impair his mind to a degree of insanity or mental weakness, and to render him incapable of making a contract. This is their opinion; but when we come to analyse their evidence, we find the facts upon which their opinions are based do not justify this conclusion. Take all the facts narrated by all the witnesses who testify as to his mental unsoundness as true, and they are not inconsistent with the sanity and mental capacity of the plaintiff. And then it must be remembered that among this host of witnesses examined by the plaintiff, there is not one of them who was present at the factum of the contract or deed.
On the other hand, an equal number of witnesses, among them three physicians, two of whom had practiced on the plaintiff' for many years, testify to his sanity. Three of these, who are unimpeached and intelligent witnesses, were present at the factum of the deed. Two, Gaines and Smith, were justices of the peace, who were present to take the acknowledgment of Walden and his wife to the deed, and who came at "Walden’s request for that purpose. All of them strongly, and without hesitation, testify to the sanity of the plaintiff at the time the deed was executed. Gaines says he had known "Walden since 1825; that he lived with him in his store as assistant in the years 1826 and 1827; that he had had many transactions with him, both as merchant or otherwise, and that nothing ever *159 occurred to indicate a want of mental soundness; and that he never had any such suspicion even. He says that on the occasion referred to when the deed was executed, he had never heard Walden talk to greater advantage; that his mind was clear, and that he was well informed upon the state of the country, which was the topic of conversation; that he was much better informed than witness had supposed he was.
There is no evidence in the record to contradict these witnesses. There is not a word of testimony conflicting with these statements of the witnesses present at the factum. But they are confirmed by evidence which Walden himself furnishes. By the deed written by himself with great particularity and technical precision, and by letters relating to the sale and the execution of the deed, expressing his regret that his wife had refused to unite in the deed, and on other subjects, all furnishing intrinsic proof of a sound mind. Evidence of this character has always been held by the courts to be entitled to far more weight and importance than the opinions of witnesses based upon the erratic conduct and eccentricities of the party of whom they speak. Temple, &c. v. Temple, 1 Hen. & Mun. 476; Mercer v. Kelso, 4 Gratt. 106; 3 Rob. Pract. o. e. 335; 1 Lomax Ex’ors 9-10.
But great stress is laid, by the learned counsel for the appellees, upon the fact that Walden, who had always been a prudent and judicious man, should have sold, for Confederate currency, at a time when it was so greatly depreciated (July, 1863) his valuable real estate, which was worth fully or nearly as much in gold as the price he received in that currency; and it is insisted that this was in itself an act of such stupendous folly as plainly to indicate his mental imbecility. It is argued, that the very fact that he was willing to receive the sum of $40 per acre in Confederate money, when he might have gotten from $60 to $80 in that currency, *160 was the strongest evidence that he was not capable of making a contract.
Up011 this point I have to say first, that there is no evidence that he could have gotten more than $40 per acre at that time. It is certain his land had been offered for sale at that price, and no purchaser was found until he offered it to Beverley. Several witnesses say the land was for sale, and the price was $40 per. acre. Walden had told his neighbors and others his land was for sale, and that was the price he fixed upon it as its value. Beverley did not seem to regard it as a very low price, or he would have been swift to purchase it. But he did not accept it when it was first offered to him; but went off to look at another farm, and did not return until two weeks afterwards. It is true witnesses say that in their opinion the land ought to have brought from $60 to $80 per acre in Confederate money. It must be remembered, however, that this contract of sale between Walden and Beverley was made just before the battle of Gettysburg. At that time General Lee, at the head of a victorious army, had crossed the Potomac'ancl marched into Pennsylvania. The heart of the Confederacy beat high with hope and surely anticipated triumph, and land and other property, at that time, bore much firmer prices than after-wards. But when that army was forced to return, there was a sudden depreciation of Confederate money, and property proportionately and suddenly advanced in price.
But, if Walden sold his land for an ante helium price, Beverley, who is held up by the plaintiff and his counsel as a man of uncommon shrewdness, did identically the same thing. It is shewn that he sold his farm just-one month before he contracted to buy Walden’s, at $27 50, in Confederate currency. It is true, Beverley invested the purchase money of his land in real estate, while Walden invested his in Confederate bonds. This *161 may have indicated superior judgment and forecast in Beverley, or it may indicate that he was less hopeful of the success of the Confederacy. Looking to the evidence, we find that Walden was a firm believer in the justice and final triumph of the Confederate cause. He had an unwavering faith in its triumphant success. When remonstrated with by his neighbors for selling his fine estate at such a sacrifice," his reasoning, from the standpoint from which he viewed the subject, was cogent and convincing, and, so far from indicating mental imbecility, was evidence of a sound and well-balanced mind. To one witness, to whom he said (before he sold the land to Beverley) that he desired to sell the farm on which he resided, and that his price was forty dollars per acre in Confederate mony; he explained that lands, after the war, would be of little value; that he had already lost some of his slaves; that labor would be disorganized; that lands could not be made available because of the great scarcity of labor; that he thought that the money which he could get for his land, invested, would be far more profitable and much less trouble to him. To another witness, he said that he was getting too old to manage such an estate, and that the money, invested, would give him much less trouble. To another witness, he said he had no fear that the Confederate bonds would not be paid; that they would be held by the fathers of the soldiers who fought the battles of the Confederacy, and he was confident there would be no repudiation of the Confederate debt. And to several witnesses he stated his price to be $40 per acre.
How, to determine whether this sale, as is earnestly insisted by the counsel for the appellee, was in itself evidence of mental imbecility, we must consider the circumstances which, at that time, surrounded the plaintiff. The section in which he. lived was within *162 the neutral ground of the belligerents. Ho man could tell how long the war would last. During its continuance; his farm would be of little or no value. Its improvements were in constant peril; its cultivation was doubtful. If he sowed, he could not tell who might reap. When he planted and raised a crop, he could not tell who might gather it. If the Southern cause triumphed, labor, near the border, would be uncertain and disorganized. If it failed, lands might be confiscated. A present income from an investment, which the success of a cause until that time victorious, would make good, was better than no income from land that might be confiscated in case of failure, or be valueless in case of success.
Such circumstances, and such reasoning as this, with the tempting bait of eight per cent, and exemption from taxation, induced thousands to part with their homesteads, to sell their real estate, and invest the proceeds in Confederate bonds. It is a part of the current public history of the times, that this was done in every county in the Commonwealth, and that, too, by the most prudent and judicious men. In the light of the present, we may say these were acts of folly; but I am yet to learn that they are to be regarded as evidence of insanity or mental imbecility. If they are so to be regarded, then the whole land is filled with lunatics and imbeciles; for, everywhere all over this southern country, there are hundreds and thousands of unfortunate men, whose families are suffering the privations of poverty, and whose hearts are yearning for the old homesteads, where they once lived in comfort, peace and plenty, which, in an unlucky moment, was sold for that which has become trash on their hands. It may be said now, their conduct was unwise and injudicious; but it cannot be said to be evidence of an unsound mind. It was a testimony of their earnest devotion *163 and living faith, in the cause they loved so well, and which they felt sure would ultimately triumph, but no testimony against their mental soundness.
If the war had terminated differently, the conduct of these men, instead of exciting the animadversions and eommisseration of their fellow men, would be pointed to as evidence of forecast and shrewdness. If John Walden, to-day, was receiving eight per cent., upon thirty-five thousand dollars, the purchase money for his farm, we should not find him here seeking the aid of a court of equity to set aside his solemn deed, upon the ground of his mental incapacity to make a contract.
The record presents the case of an old man, of some eccentricities of character, the victim of a painful malady, and harassed by domestic troubles, bemoaning the great folly of his life in having sold his valuable estate for that which has proved of no value; and looking back upon that unfortunate act, persuades, himself, in the light of present circumstances, that he, in his own language, “ could not have been possessed of a sound mind and understanding, or he never would have enacted such a part.” All this may awaken sympathy and excite pity, but I am constrained to say it presents no case for the intervention of a court of equity. I am therefore of opinion that the Circuit court of Fauquier erred in ordering an issue. It ought to have dissolved the injunction and dismissed the plaintiff’s bill.
Staples and Anderson, Js., concurred in the opinion of Christian, J.; except that they did not think the denial of the answer, of the incapacity of the plaintiff, was such as to require two witnesses, or one witness with ¡strong corroborating circumstances, to overthrow the •answer; but only to put the plaintiff upon proof.
Moncure, P. concurred in the opinion. He thought *164 the denial of the answer of the insanity of the plaintiff did require two witnesses, or one with strong corroborating circumstances, to overthrow- it.'
Decrees reversed and bill dismissed.